GEORGE FREEMAN AND JAMES FREEMAN v. THE
DULUTH, SOUTH SHORE & ATLANTIC RAILWAY
COMPANY.

*Negligence—Railroad companies—Failure to place flag-man at
street crossing—Contributory negligence.*

1. It is not the law of this State that at every road or street cross-
ing in a village or city a railroad company is bound to place a
flag-man.

2. The statute charges the Railroad Commissioner with the duty of
determining the necessity of establishing a flag-man upon any
particular street crossing of a railroad, and his absence is of
*itself* no evidence of negligence upon the part of the railroad
company, but it must appear that the circumstances of the
crossing are such that common prudence would dictate that
the company should place a flag-man, or his equivalent, at
such crossing.

3. The duty of maintaining a flag-man at a street crossing, in the
absence of orders from the Railroad Commissioner, does not
depend upon the question whether the party injured in a par-
ticular case could by common prudence have avoided the col-
lision causing such injury, but rather upon the situation of the
crossing, its relation to the travel upon the street generally,
and the facilities afforded, not only to the travelers on the
street, but to the train-men on the cars, to avoid such collis-
ions and accidents, without a flag-man to give warning of
approaching trains.

4. When an engineer, at a distance beyond 75 feet from the cross-
ing of a street in a city like Marquette, cannot see into the
street except the straight line thereof where the track crosses,
and the traveler cannot see even the top of the locomotive
until he gets within 40 feet of the track, something more than
ordinary pains to prevent accidents is incumbent both on the
railroad company and also on the traveler, if he is acquainted
with the situation.

5. It was not held, nor intended to be held, in *Battishill v. Hum-
phreys,* 64 Mich. 511, that there could be no negligence, in any
case, in not maintaining a flag-man at a street crossing unless
ordered by the Railroad Commissioner.

6. A railroad track is a perpetual menace of danger, and the traveler is not excused if his eyes and ears are not kept open up to such a distance of it that he may stop if he can see or hear an approaching train.

7. Under the testimony in this case the driver of plaintiffs' horse is held to have been guilty of contributory negligence, it appearing that, if he had looked up the railroad track at any time while passing over the 40 feet last traversed before driving upon the crossing, he must have seen the approaching train, and thus been enabled to avoid the collision, he being familiar with the situation at said crossing.

8. In this case it is held that the railroad company was at fault in not having a flag-man at the street crossing, and that the driver of plaintiffs' horse was at fault in being careless and reckless in his driving, which fault contributed to his injury, and that plaintiffs cannot recover unless the defendant was guilty of such reckless negligence in the premises as to acquit the driver of his fault, which fact is not shown.

Error to Marquette. (Grant, J.) Argued February 1, 1889. Decided February 8, 1889.

Case. Defendant brings error. Reversed. The facts are stated in the opinion.

*W. P. Healy,* for appellant, contended:

1. Where the testimony of a witness is in direct conflict with admitted facts, it will be disregarded; citing *Bloomfield v. Railway Co.*, 74 Iowa, 607.

2. I do not claim that Grant ought to have got out of the buggy. But with three men in it, one sitting on the laps of the others, and Grant being on the side away from where the train approached, he was not in a good position to keep a good lookout while driving (and talking to Sundberg, as he admits), and hence there was contributory negligence; citing *Kwiotkowski v. Railway Co.*, 70 Mich. 549; *Bloomfield v. Railway Co.*, 74 Iowa, 607.

3. Under the statutes of this State the duty of determining where flag-men should be stationed devolves upon the Railroad Commissioner. Cases may arise where a flag-man ought to be kept, if not ordered by such Commissioner; citing *Guggenheim v. Railway Co.*, 66 Mich. 162; but they are exceptional, and exceedingly rare.

*F. O. Clark,* for plaintiffs, contended:

1. In support of the right of the jury to pass upon the question of contributory negligence upon the testimony in this case, counsel cited *Railroad Co. v. Van Steinburg,* 17 Mich. 99; *Railroad Co. v. Coleman,* 28 Id. 440; *Railroad Co. v. Miller,* 25 Id. 274; *Teipel v. Hilsendegen,* 44 Id. 462; *Railroad Co. v. Marcott,* 41 Id. 439; *Billings v. Breinig,* 45 Id. 65; *Marcott v. Railroad Co.,* 47 Id. 1; *Improvement Co. v. Munson,* 14 Wall. 448; *Jucker v. Railway Co.,* 52 Wis. 150.

2. A railroad company is required to use special care in passing through a city and passing street crossings, so as to guard against the possibility of injury to travelers upon the public thoroughfare, and the like duty is imposed upon them; citing *Railroad Co. v. Huntley,* 38 Mich. 537; *Linfield v. Railroad Corp.,* 10 Cush. 562; *Bradley v. Railroad Co.,* 2 Id. 539; *Shaw v. Railroad Corp ,* 8 Gray, 45; *Railroad Co. v. Still,* 19 Ill. 499; *Butler v. Railway Co.,* 28 Wis. 487.

3. As to cases of collisions between railroads and teams at crossings, counsel cited *Mabley v. Kittleberger,* 37 Mich. 360; *Daniels v. Clegg,* 28 Id. 32; *Railroad Co. v. Anderson,* 20 Id. 244.

MORSE, J. The plaintiffs sue for the value of a horse and carriage destroyed by collision with an engine on defendant's track at the Genesee-street crossing in the city of Marquette.

The plaintiffs keep a livery-stable in said city, and on the day of the accident hired the horse and carriage to one John Grant, who was driving the same at the time of the collision. During the course of the trial, by mutual consent of the parties, the place of the accident was visited. The following appears in the record in reference to such visit :

"The court thereupon took a recess for one hour, and the court, counsel, jury, and court officers, by stipulation of the counsel, visited the scene of the accident. The jury then proceeded to measure the distance from the intersection of Champion street with Genesee street to the track in question, and found the same to be 186 feet. It was also ascertained as a fact in the case that a person standing 40 feet west of the track in question, in the center of Genesee street, could see the top of a

locomotive 179 feet north of the center of Genesee street, on the track in question. The court, jury, court officers, and counsel for the respective parties, after ascertaining these distances, returned again to the court-room, to proceed with the trial of the said cause."

A diagram showing the streets, measurements, and railroad track is given below :

*A* 179 feet. R. R. Track.

E.

N.——S.

W.

Scale, 80 feet to one inch.

185 feet from Track to Champion street.

40 feet.

*B*

GENESEE STREET.

*A,* point where top of locomotive could be seen from point *B,* 40 feet back from track on Genesee street.

CHAMPION STREET.

It will thus be seen that it was established as an undisputed fact in the case that a person standing in the center of Genesee street, at the point B, could see the top of a locomotive at the point A, 179 feet north of the intersection of the railroad track with the center of said Genesee street. It was also conceded on the argument here that, the nearer you approached the railroad track from the point B, the further you could see a locomotive coming from the north on said track, while west of the point B, between such point and Champion street, the view of the track north of Genesee street was nearly,

if not entirely, obstructed and shut off by the high bank on the north side of said street.

The jury were charged by the court, and retired to deliberate upon the case. After being out for a time, they returned into court for further instructions, whereupon the following proceedings took place:

"*Juror*. The question is whether the omission of a flag-man at that crossing is a preponderance of evidence in favor of the plaintiff.

"*Court*. Whether there is a preponderance of evidence?

"*Juror*. Yes, sir; of the defendant having no flagman there. That seems to be the great question,—not having a flag-man there. Perhaps some other juror can explain better.

"*Another Juror*. Well, we think the evidence is all equally balanced outside of the omission of the flag-man. We all want to know whether the omission of a flagman will overbalance all the other evidence.

"*Court*. I don't know as I exactly understand. There are the three allegations of negligence; you will discuss them each separately. If you have disposed of the question of the bell-ringing and the blowing of the whistle, and if you find that the bell was rung and the whistle was blown, then, of course, there was no negligence there; then it leaves you simply the question of whether or not it was negligence in failing to put the flag-man there. Is that the point?

"*Juror*. That is the point."

The court then read to them what he had before instructed them in regard to the duty of the defendant to have a watchman or flagman at this street, and added some further remarks to the same import, and in the same direction, which instructions we shall refer to hereafter. It will therefore be seen that it is to be presumed from this colloquy between the court and jury that the questions whether the whistle was blown and the bell rung in compliance with the statute, and in such manner that there was no negligence on the part of defend-

ant in either of these respects, had been determined in favor of the defendant, and that the sole negligence remaining to be found against the railroad company was that of the absence of a flag-man at this crossing; and if the absence of such flag-man was not negligence, the plaintiffs ought not to, and would not, have recovered.

The contention of the defendant is that it was not negligence. It is claimed that under the statutes of this State the duty of determining where flag-men shall be stationed devolves upon the Railroad Commissioner; and that, in order to hold defendant liable for such negligence in this case, it should have appeared in proof that the Railroad Commissioner had ordered a flag-man to be stationed at this crossing, and that his orders were not obeyed; or that the crossing was such an exceptionally dangerous one that a common-law duty was imposed on the defendant to keep a flag-man at that point; and that no showing of this kind was made in this case.

We think the judge below ruled correctly on this point, and in accordance with our previous decisions. The jury were instructed, substantially, that it is not the law of this State that at every road or street crossing in a village or city a railroad company is bound to place a flag-man. The law puts upon the Railroad Commissioner the duty of determining the necessity of establishing a flag-man upon any particular street crossing of a railroad, and the absence of a flag-man at Genesee street crossing, where the accident occurred, is of itself no evidence of negligence upon the part of the defendant. And the plaintiff must show that the circumstances of the crossing are such that common prudence would dictate that the railroad company should place a flag-man there, or his equivalent. That before the jury could find this, it must be made to appear to them that the danger at the crossing was altogether exceptional,—that there was something

about the case rendering ordinary care on the part of the witness Grant (the driver of the horse and carriage) an insufficient protection against injury, and therefore made the assumption of the burden of a flag-man on the part of the railroad company a matter of common duty for the safety of people crossing.

"You have, as I said before, been at this crossing. You have seen the situation. You have seen its relation to travel and to the city; and it is for you to determine, if you reach that point, under all the circumstances of the case, whether or not it was negligence, under the instructions I have given you and the evidence, not to have a flag-man there."

If any fault can be found with this charge, it was too favorable to the defendant, in that it connected the necessity of keeping a flag-man at this crossing with the use of ordinary care on the part of Grant. The duty of maintaining a flag-man at this point did not depend on the question whether Grant, in this particular instance, could by common prudence have avoided this collision or not. It depended rather upon the situation of the crossing, its relation to the travel upon the street generally, and the facilities afforded, not only the travelers on the street, but the train-men on the cars, to avoid collisions and accidents of this kind, without a flag-man to give warning of approaching trains.

I think the jury were warranted in finding it to be negligence in the defendant in not providing a watchman at this point. It seems that to the south from Genesee street there was a steep up-grade, so that a train of loaded cars must, in order to ascend the same, cross the street at a higher rate of speed than would, considering the situation of the crossing, be prudent to the safety of passers on the street, without warning of the train's approach. A train coming from the north could not be seen at all by those traveling on the street in the

direction Grant was driving, until the traveler was within 40 feet of the track, and the train within from 150 to 175 feet of the center of the street. And the engineer on the train, being lower down in his cab than a man in a buggy, could not get his eye into Genesee street, west of the track, as was the fact in this case, until the locomotive was within 60 or 75 feet from the crossing; and then his vision would only extend 40 or 50 feet west of the track on the street. Under such circumstances, a train ought to run over this crossing so that it could be stopped at once, or a flag-man ought to be stationed where he could give warning of its approach. When an engineer, at a distance beyond 75 feet from the crossing of a street in a city like Marquette, cannot see into the street except the straight line thereof where the track crosses, and the traveler cannot see even the top of the locomotive until he gets within 40 feet of the track, something more than ordinary pains to prevent accidents is incumbent both on the railroad company and also on the traveler, if such traveler is acquainted with the situation.

In *Battishill v. Humphreys*, 64 Mich. 511 (31 N. W. Rep. 903), we held, under the pleadings and testimony in the case, that the absence of a flag-man at Summit-avenue crossing in Detroit could not be considered negligence in the railroad company, as the Railroad Commissioner had not determined that it was necessary to maintain one there. But nothing was said, or intended to be said, in that opinion that there could be no negligence, in any case, in not maintaining a flag-man at a street crossing unless such Commissioner had ordered one to be stationed there. In *Guggenheim v. Railway Co.*, 66 Mich. 162 (33 N. W. Rep. 167, 168), the law in this respect is laid down substantially as the circuit judge in this case instructed the jury.

The most serious question in the case is the imputed
contributory negligence of the driver, Grant. It is
claimed by the defendant that Grant was negligent, from
his own testimony, and that of one of the persons who
was with him, Sundberg, and that a verdict should have
been directed for the defendant for this reason. The
court below submitted this question to the jury. It
appears without dispute that both Grant and Sundberg
had been drinking considerably during the day. It was
the day of the county fair, and Sundberg had come on
the cars from Ishpeming to attend it. Grant had hired
the team, in the first place, to take his wife to the fair.
In the afternoon he fell in with Sundberg, an old
acquaintance of his. He sent his wife home, or up to
the fair; a boy by the name of Pritz driving. While
waiting for the boy to return, he and Sundberg visited
four or five saloons, and drank beer in most of them.
When Pritz came back with the horse the three of them
went for a drive. It was about 6 o'clock, or a little
after, in the evening; but it was not yet dark. Grant
sat on the right-hand side of the carriage, and Sundberg
on the left, the boy on their knees, and between them.
They came down Champion street on a trot, and turned
into Genesee street, going east. Sundberg was then, of
course, on the north side of the carriage-seat, and on the
side towards the approaching train. Grant thinks he
came to a stop before he came to the track, but he can-
not say that he did "because I ain't sure." Sundberg
says:

"We didn't drive very fast when we got down to the
corner there, down to the railroad track; just *trotting*
along slowly."

Jessie Smith, who saw the accident, and was sworn for
the plaintiffs, says that—

" They were driving kind of slow trot as they went by the house.   *   *   *   I saw the buggy come along on a slow trot, and the first thing I knew, I saw the train strike the buggy, or horse."

It is plain from all the evidence that the horse was not stopped, but that he was trotting from Champion street, through Genesee, until the accident.

The next question is, did the driver look?  It is, as before said, an established fact in the case that the train could have been seen from any point within 40 feet of the track, 179 feet north of the center of Genesee street. If the train was running 12 miles an hour,—the fastest time testified to by any witness,—the locomotive would have occupied about 10 seconds in passing over this 179 feet.  The horse would have reached the track and passed it within that time, if on a trot,—the distance being 40 feet and the width of the track.  It would seem, therefore, to be an absolute certainty that if Grant had looked north when he was 40, 30, or 20 feet from the track, he would have seen this train.  He could, at either of these points, have stopped his horse, and saved the accident. When he was within 40 feet of the track, the train must have been in plain sight, or he would have passed over the track in safety in front of it, because he could not have seen it if it had been more than 179 feet away, and, if so, it would not have struck him, because at 12 miles an hour, or less, it would have required 10 seconds or more to have reached the place of the accident.  If it was in plain sight when he was 40 feet away, it was in plain sight from that time until the collision, to one looking north for it.  Sundberg swears that he did not look to the north after they passed about the center between Champion and Genesee streets, until "just as we got up to the railroad track."  Then it was too late to stop.

" *Q.* If you were looking, couldn't you have seen it, if you had looked, say 20 feet away from the track?

" *A.* If we had stopped and looked, I think we could."

He further testified, on cross-examination, that if the horse had stopped 20 feet away from the track, he thought the train would have been seen; but—

"As long as we didn't see the train we were going ahead. I didn't look and see it in time; not after I looked the first time"—

Referring to his first look to the north from half way up Genesee street. From Champion street to the track crossing Genesee street is 186 feet. He therefore looked to the north from a point more than 90 feet from the track, where his view of the train was entirely obstructed by the high bank. Sundberg was a stranger to this crossing, and might perhaps be excused from looking again, as he testifies that after looking north he looked to the south. Seeing no train approaching from either way, he then looked at the crossing, saw that was clear, and thereafter kept his eyes upon it. The boy Pritz was in Europe at the time of the trial, and was not sworn.

Grant testifies:

"As I approached the track, I saw it ahead. I was looking around to see if anything was moving or coming, looking all over, to see if anything was moving there that I should have to stop for. I did not hear any train coming. I heard nothing. I did not hear any bell ringing, or any whistle blowing; I should think I would have heard a bell or whistle if there had been any rung or blown. My hearing was good at that time. When I first saw the engine, the horse was just stepping across the track,—across the first track. I could not say how near the engine was to the horse at that time, but it could not have been very far. It wasn't far; just close by. I tried to back up to get out of the way, but I could not get out fast enough. There was a bank on the left-hand side along the track where the engine was ccoming down."

And that a person could not see over the bank to the north, while driving on Genesee street, and notice a train until the track was reached. This evidence was given before the jury examined the premises. On cross-examination he testified that a person standing on Genesee street, forty feet west of the track, he thought could not see the top of a locomotive 150 feet up the track to the north, but that he had never tried it to see. We are impelled to the conclusion that if Grant looked to the north for an approaching train, as he says he did, he did not so look after he came within forty feet of the track. He must have looked back somewhere near where Sundberg did, and where the bank obscured his vision.

Grant was not a stranger to this crossing, and the question arises, was his full duty performed? We think not. Was he acting with even ordinary prudence, when he was driving this 40 feet, without looking to the north? Could he excuse himself by looking north, where he knew the high bank cut off his view, and then drive straight onto the track, without looking again, when the track was in sight to the north, because he heard, as he says, no bell or whistle, or noise of an approaching train? We think the answer must be in the negative. A railroad track is a perpetual menace of danger, and the traveler is not excused if his eyes and ears are not kept open up to such distance of it that he may stop if he can see or hear its approach. If he had looked at any time within the 40 feet before he drove his horse upon the track, we think he must inevitably have seen this train, and could have saved a collision; and that, knowing the situation at the crossing as he did, he was guilty of contributory negligence in not doing so. There is a fair inference to be drawn from his own testimony, and that of his companion Sundberg, that both had drank so much

74 MICH.—7.

that they did not exercise the usual caution that a sober man uses in such an emergency; and that the recklessness of too much drink, though neither might be called drunk, had something to do with their neglect to take ordinary precaution and prudence in attempting to make this crossing. The conclusion is irresistible that they drove down Genesee street upon a trot, and, without looking to the north, when they ought to have done so, ran the horse negligently and carelessly on the track and in the way of the locomotive.

It is no answer to say that if the company had not been negligent in the matter of a flag-man the accident would not have happened. It must be considered, as before said, that the jury determined that there was no negligence on the defendant's part in relation to the blowing of the whistle and the ringing of the bell. The testimony was conflicting on these points, and the jury evidently found against the plaintiff in this respect. If Grant had exercised common ordinary prudence at this known to him to be a dangerous crossing, the collision would not have taken place. The company was at fault in not having a flag-man, and he was at fault in being careless and reckless in his driving, without looking, as he ought to have looked. His fault contributed to the injury, and plaintiffs cannot recover unless the defendant was guilty of such reckless negligence in the premises that the question of contributory negligence cannot arise in the case, as in *Battishill v. Humphreys*, 64 Mich. 514 (38 N. W. Rep. 582). The testimony, in our opinion, did not show such reckless and wanton negligence on the part of the defendant as would acquit the driver of his fault. A verdict should therefore have been directed for the defendant.

The judgment must be reversed, with costs, and a new trial granted.

SHERWOOD, C. J., CHAMPLIN and CAMPBELL, JJ., concurred. LONG, J., did not sit.