PUTT v. GRAND RAPIDS & INDIANA RAILWAY CO.

1. RAILROADS— CROSSINGS— NEGLIGENCE— CONTRIBUTORY NEGLI-GENCE.
Plaintiff, who was very deaf, was guilty of contributory negli-gence in standing on defendant's tracks at a street crossing, his attention being engaged by an occurrence in the street, until he was struck by a locomotive approaching with the bell ringing, plaintiff's back being towards the train.

2. SAME—GROSS NEGLIGENCE—LAST CLEAR CHANCE.
Nor was defendant's engineer chargeable with gross negligence where he backed his engine over the crossing, keeping a look-out, and having his locomotive under control, running about six miles an hour, but being prevented by his tender from seeing plaintiff who stood at one side of the track.

3. WORDS AND PHRASES—GROSS NEGLIGENCE—DEFINITION.

Gross negligence means the intentional failure to perform a manifest duty, in reckless disregard of the consequences, as affecting the life or property of another. It also implies thoughtless disregard of consequences, without the exercise of any effort to avoid them.

Error to Kent; McDonald, J. Submitted April 15, 1912. (Docket No. 145.) Decided July 11, 1912. Rehearing denied October 7, 1912.

Case by Charles W. Putt against the Grand Rapids & Indiana Railway Company, for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed and no new trial ordered.

*James H. Campbell,* for appellant.

*Geo. E. & M. A. Nichols* and *Dunham & Phelps,* for appellee.

Second avenue is a street running east and west in the city of Grand Rapids. It is crossed by five railway tracks. The two easterly tracks are Michigan Central side tracks, the next one is the Michigan Central main track, next west of that is defendant's main track, and west of that again is the Michigan Central transfer track. A flagman is stationed at this crossing. His shanty is located just west of all tracks and north of the northerly sidewalk on Second avenue.

On the morning of plaintiff's injury, an engine left the roundhouse at Ninth avenue at about 9:30 a. m. It moved north to the main track which it entered 229 feet south of Second avenue, thence north on defendant's track across Second avenue and First avenue, to a point north of the signal bridge, north of First avenue. It was necessary for the engine to go to a point north of this bridge to get through the interlocker. There it came to a stop and received the signal, and then backed south along the main track across First avenue and Second avenue on its

way to the south yards, where it was to take out a freight train to Muskegon.

The plaintiff, a man of mature years, approached this crossing from the west on the northerly sidewalk, intending to cross the tracks to a planing mill just east of the tracks. When near the westerly track, plaintiff noticed defendant's engine going north. After it had passed, he stepped upon defendant's main track. As he did so, his attention was attracted to a man who was having trouble with a load of lumber; the load having tilted up. Plaintiff stood on the track watching this man for a short time, he says 15 or 20 seconds, when he was struck by the engine which was returning south. Just before he was struck, he turned his head and saw the engine upon him. He attempted to jump to the west, being near the west rail, but was struck by the southwest corner of the tender. Plaintiff suffered a compound fracture of both bones of the left leg. At the time of the trial, the bones had failed to unite, and it was the opinion of the surgeon that amputation of the foot would be ultimately necessary. Plaintiff was very deaf, so deaf as to be unable to hear the approaching engine, although it was equipped with a bell 16 by 14 inches, weighing 98 pounds, which was constantly ringing as it approached and crossed Second avenue.

The crossing in question is a busy one, many trains passing and repassing each day. Plaintiff was familiar with the crossing, having passed over it the evening before his injury. He testifies that, as he approached the crossing on the morning, he saw no watchman though he looked for him.

It appears from the record that at or very near the time the engine in question was backing south across Second avenue, a Michigan Central train, bound north on the Michigan Central main track, that being the next track east of defendant's main track, reached the same point. The engineer in charge of the engine testified, in part, as follows:

" The rule as to the rate of speed through that interlocker district was at that time 6 miles an hour.   When I got the signal from the towerman, I went south down the main track, went back south.   I ran south on the main track to the B. O. tower, or south yards.   Going south from First to Second and Third avenues, the engine was running at not to exceed 6 miles an hour at any place.   I was then inside of the interlocker district.   The fireman (Stevens) was in the engine with me, nobody else.

"*Q.* What were you doing and where were you on the engine as you ran south ?

"*A.* Looking toward the way we were going.

"*Q.* Where were you, in the cab ?

"*A.* In the cab.

"*Q.* On which side of the cab?

"*A.* I was on the— It would be on the east side of the tracks, backing up.

"*Q.* As you were backing the engine down there across First avenue, and on across Second avenue, state what you were doing, whether you were keeping any outlook in the direction you were going?

"*A.* I was looking out of the cab in the direction I was going.

"*Q.* Where did you look out of the cab there; did you have your head out of the window ?

"*A.* Yes, sir.

"*Q.* You were looking out of the east window of the cab far enough to look ahead ?

"*A.* Yes.

"*Q.* Did you see any person on or near the track between First or Second avenue, as you went south?

"*A.* I did not.

"*Q.* Did you see anything of this accident ?

"*A.* No, sir.

"*Q.* Did you see the man when he was struck ?

"*A.* No, sir.

"*Q.* When did you first know you struck him ?

"*A.* When I arrived at the B. O. tower.

"*Q.* I think the testimony shows that he was on the westerly side of the main track, and state whether or not you could see that point, the southwest corner of the tender ?

"*A.* It takes, I should judge, 200 or 300 feet to see across when the engine is backing up, with this kind of a backing, that I had loaded with coal; it is quite a distance that you go the other side of the track.

"*Q.* As you moved on from the signal bridge from First avenue, could you see Second avenue and the main track at that point?

"*A.* I think you could.

"*Q.* And you could see it for some distance going on south, until you got so near that the tender was between you and the westerly side of the track, is that right?

"*A.* Yes, it takes at least 200 or 300 feet, if I am not mistaken, to see across from the tender onto the other side of the track. The fireman was putting in the fire, shoveling coal into the fire box, and his attention was on that. It was a necessary part of the work. It was a steam locomotive, and the fuel used was coal. There was a bell on that engine. I do not know the size or weight of it. I heard Mr. Habercorn's testimony; that was a correct description of the bell in my judgment. That bell was rung as the engine moved south. It was ringing from the time we left the roundhouse until we arrived at the B. O. tower, and was ringing when I crossed First avenue and Second avenue. It rang automatically, by air. That engine was No. 50. I left the roundhouse about 9:35. I would not say exact, but about that. I was to take the train at 10 o'clock."

On cross-examination, he testified:

"*Q.* Now, as you started back south, did you notice a Michigan Central train up by the signal bridge, or beyond that?

"*A.* Yes, sir.

"*Q.* Were you watching that train?

"*A.* I was.

"*Q.* So your attention was— From the time you started from that interlocker looking north, you had your eye on the Michigan Central train?

"*A.* Well, and on the track.

"*Q.* But you had your eye on the train?

"*A.* I saw the train.

"*Q.* And you were watching it, were you not?

"*A.* Yes, sir.

"*Q.* Now you depend considerably upon your watchman at this crossing, for he will see that there is no one in the way?

"*A.* That is what he is there for, I suppose.

"*Q.* And when you start back it is customary that on these crossings that you know a flagman is regularly sta-

tioned for you to rely on that flagman to do his duty, and, if there is anything in the way, to give warning to the parties, to give warning to you?

"*A.* Yes, sir.   *   *   *

"*Q.* Here is the window of that cab; does your tender extend any beyond that, or is it just even with it?

"*A.* It is a little inside.

"*Q.* About how much?

"*A.* About 4 inches.

"*Q.* About 4 inches inside of the cab window?

"*A.* Yes, sir.

"*Q.* And you were looking out of the east window of your locomotive?

"*A.* Yes, sir.

"*Q.* And if you— To get a full view of this crossing or of any crossing as you back up where the line is perfectly straight—that is, where the road is straight, the rails running straight—you say you cannot see the track; your vision is cut off from the track some 200 or 300 feet?

"*A.* I should judge it was that far; I never measured it. It stands to reason you could not see.

"*Q.* Have you any recollection whatever that morning of taking any particular notice of the conditions up there at Second avenue as you started back?

"*A.* No.

"*Q.* And, as you were depending upon the watchman, the man might have been there and you not noticed him a way down there at the signal bridge standing on the side-walk?

"*A.* He might have been there."

Upon redirect examination, this witness further testified:

"The Michigan Central train, when I first saw it, was about Fifth avenue, and it was going north. I had nothing to do with that train; it was running on another track. I was running on the Grand Rapids & Indiana main track, and that is the track that I was watching. I passed the rear of the Michigan Central train at Third avenue. Just before meeting the Michigan Central train, I slowed down, even slower than I was running. The reason for doing that, most always when a train passes on a parallel track like that, some one is apt to come in behind it, and you are apt to catch them going in the opposite direction. That is, the possibility of some one on

the east side of the Michigan Central track going west, waiting until the Michigan Central train passed north, and then going right on to the Grand Rapids & Indiana track. I was looking out for that. I pulled the speed down almost to a stop; that is where people get hurt most and worst. I did not see Mr. Putt at all."

The watchman at the crossing testified in part as follows:

"*Q.* Where were you standing at the time he was struck?

"*A.* I was standing right in the center of the street.

"*Q.* On which side of the Grand Rapids & Indiana main track?

"*A.* On the west side.

"*Q.* And how near to the main track?

"*A.* About seven feet where I stood.

"*Q.* And in the center of the street?

"*A.* Yes, sir.

"*Q.* Did you see the passenger train coming from the south at that time?

"*A.* Yes, sir.

"*Q.* Were there any people on either side of the tracks about to cross the tracks in either direction?

"*A.* No, sir.

"*Q.* Did you look west?

"*A.* Yes, I looked west; I looked, I started and I looked up first west and there was nothing there, and I turned around and looked east, and then turned around and looked on the north side, and that fellow got struck at the same time.

"*Q.* Let me see if I understand you. You saw this train coming, the passenger train was coming from the south?

"*A.* Yes, sir.

"*Q.* And the engine was coming down from the north at the same time—the Grand Rapids & Indiana engine?

"*A.* The Grand Rapids & Indiana went first.

"*Q.* But, when you looked there, they were both coming to the crossing?

"*A.* Yes.

"*Q.* The engine from the north and the passenger train from the south?

"*A.* Yes, sir.

"*Q.* Now, you say you looked around?

"*A.* I came up from my shed, from my watchhouse, and I looked around there if something were there.

" *Q.* You looked west?

"*A.* Yes.

" *Q.* Did you see anybody on the street or sidewalk?

"*A.* No, not so far as I could see.

" *Q.* Then did you look east on the street?

"*A.* Then I turned around and the Michigan Central freight comes, and I turned around and looked, and the engine, at the same time that fellow there, he comes across.

" *Q.* He was struck just as you looked around?

"*A.* Yes, at the same time.

" *Q.* Had you seen him before that anywhere?

"*A.* No, not that day.

" *Q.* That morning?

"*A.* No, sir."

Charles Sleeman, a witness for plaintiff, was close to the crossing at the time of the accident. He testified that he saw the engine pass, and just when it passed he saw the plaintiff; that he went right over and helped pick him up; that there was some one else there, the flagman at the crossing. The court charged the jury that plaintiff was guilty of contributory negligence, as a matter of law, and that there could be no recovery unless his injuries were occasioned by the gross negligence of the defendant.

Upon the question of gross negligence the court charged:

" In order that you may be able to determine whether the defendant, through its enginemen or crossing tender or either or any of them, was grossly negligent, I will give you the legal definition of gross negligence, which has been said by our court to be:

" ' It means the intentional failure to perform a manifest duty, in reckless disregard of the consequences, as affecting the life or property of another. It also implies a thoughtless disregard of consequences, without the exertion of any effort to avoid them.'

" From this definition you will see that gross negligence will consist either in the intentional failure to perform a manifest duty in reckless disregard of consequences, or it may imply a thoughtless disregard of consequences without the exertion of any effort to avoid them.   *   *   *

" ' If the employés of the railroad company saw the plaintiff in danger, or if they did not actually see him, but by exercising ordinary care in the discharge of their duties, they would have seen him and should have discovered the danger that he was in in time to avert the injury, and either failed after discovering it to take steps to avert it, or failed to discover the danger at all, the fact that the plaintiff's danger arose in the first place through his own negligence in standing upon the track will not prevent his recovering for the injury sustained in this case.'

"So that, if you find that the engineer backed his engine over the crossing without looking to see whether any one was upon the crossing; if you find that he saw or could have seen the plaintiff standing upon the sidewalk of the crossing and did not check the speed of the train or in any other way use ordinary care to prevent striking him, he was guilty of gross negligence, and the plaintiff can recover, notwithstanding that he had previously negligently placed himself in such position of danger.   A railroad company is guilty of gross negligence if it backs a train over a public crossing, especially in a populous place, unless ordinary care is used for the protection of travelers.   This is one of the questions for you to determine:   Did the defendant, through its employés, discover the danger in which the plaintiff had placed himself, or by the exercise of ordinary care should have discovered it, and did they use ordinary care to prevent injury to the plaintiff?   You will determine this from all the evidence in the case, and that is really the only question that you have to determine; it is the main question that you have to determine in this case.   *   *   *

"I charge you that it was the duty of the crossing tender to use all reasonable efforts to be in such a position or place upon said crossing that he would be able to stop pedestrians or travelers upon Second avenue coming from either direction when a train was about to pass, and, if he failed to do this, he neglected his duty, and if you find that the crossing tender, at the time plaintiff was standing upon the crosswalk (if you find that he stood there) was not in such position that he could have warned the plaintiff, or by the use of ordinary care he might have known and discovered plaintiff's position, then the defendant is guilty of gross negligence, and the plaintiff is entitled to recover."

BROOKE, J. (*after stating the facts*).    It is the position of defendant that, under the testimony in this record, a verdict should have been directed for the defendant.    It is not disputed that the speed of the engine was not greater than six miles per hour, nor that the bell upon the engine was constantly ringing as it approached the crossing where plaintiff received his injury.    There is no dispute as to the actions of the engineer or fireman immediately before the accident.    The engineer testified that, from his proper position upon the easterly side of the engine, he kept such lookout as was possible from his point of view, while the fireman was engaged with his particular work— that of shoveling coal.    As the engine approached Second avenue from the north, the engineer's line of vision would gradually be cut off by the tender, so that, when 200 or 300 feet from Second avenue, he would be unable to see a man standing nearer the westerly rail of the track than the easterly rail, the position which plaintiff asserts he occupied while standing upon the track.    He testifies that he never saw the plaintiff, and did not know that his engine had injured any one until he reached the B. O. tower, some distance south of Second avenue.

But, assuming that the engineer saw plaintiff standing upon the track 200 to 300 feet away, at the rate of speed at which he was traveling it would take at least 30 seconds to travel this distance, while the plaintiff could step off the track and reach a place of safety in the fractional part of a single second.    With the bell sounding a constant warning, with no notice of plaintiff's infirmity, and considering his rate of travel, we are of opinion that the engineer would have had a right to presume that the plaintiff would step off the track before the engine reached him, and that the engineer would not have been guilty of even ordinary negligence in continuing upon his course upon that assumption.

It is said by the plaintiff that the watchman was not there.    It is clear from the testimony of plaintiff's witness

171 MICH.—15.

Sleeman that the watchman was there just as the engine passed. But, even if the watchman was not at his post at the moment plaintiff stepped upon the track of defendant and remained standing there, that fact cannot aid plaintiff, for, according to his own testimony, he knew the watchman was not there, and therefore could not have relied upon his protection. He testified:

" *Q.* When you looked for the crossing tender, you did not find him; did you think he was there, or did you think he was not there?

"*A.* I knew nothing about that, but I think he was not there at his place to watch the crossing; I didn't know where he was, but he was not there.

"*Q.* Then, when you looked up for him and did not find him there, why did you stand on the track with your back to the north, depending on the crossing tender doing his duty to warn you?

"*A.* Because I was not expecting any danger. There was nobody there to warn me if there was anything coming, and the time was only of a few seconds' duration that I stopped.

"*Q.* You knew it was more dangerous for you to stand on the railroad track than for a man that could hear?

"*A.* Yes, sir.

"*Q.* And you did not hear anything until this engine was right on you?

"*A.* Sir?

"*Q.* You did not hear anything until this engine was right on you?

"*A.* I did not hear the engine at all when I saw it.

"*Q.* The only thing that warned you that it was going was you turning around and seeing it?

"*A.* Sir?

"*Q.* You had no warning it was coming until you turned and saw it?

"*A.* I had no warning at all, in no way, either by the watchman or by sound.

"*Q.* And then you said it was within about six feet of you?

"*A.* I should judge it was that close to me when I first saw it.

"*Q.* Did you have time to examine the end of the tender to see what was on it?

"*A.* I did not nave any more time than just to glance over the back of the engine and to try to get out of the road.

"*Q.* And you made a jump, you said, backward?

"*A.* Sir?

"*Q.* You jumped backward, you said?

"*A.* I jumped backward to get off the track.

"*Q.* In other words, you jumped toward the west?

"*A.* I jumped toward the west, yes."

This court has held that, where plaintiff's negligence contributed to his injury, he cannot recover "without intentional wrong" on the part of the defendant. *Williams* v. *Railroad Co.*, 2 Mich. 259 (55 Am. Dec. 59). "Without wanton or intentional wrong." *Lake Shore, etc., R. Co.* v. *Miller*, 25 Mich. 274. "Unless the defendant was guilty of such reckless and wanton negligence" as would acquit the plaintiff. *Freeman* v. *Railway Co.*, 74 Mich. 86 (41 N. W. 872, 3 L. R. A. 594). "Gross negligence" means "the intentional failure to perform a manifest duty, in reckless disregard of the consequences, as affecting the life or property of another. It also implies a thoughtless disregard of consequences, without the exercise of any effort to avoid them." *Schindler* v. *Railway Co.*, 87 Mich. 400 (49 N. W. 670). See, also, *Richter* v. *Harper*, 95 Mich. 221 (54 N. W. 768); *Labarge* v. *Railroad Co.*, 134 Mich. 139 (95 N. W. 1073); *Buxton* v. *Ainsworth*, 138 Mich. 532 (101 N. W. 817, 5 Am. & Eng. Ann. Cas. 146); *Knickerbocker* v. *Railway Co.*, 167 Mich. 596 (133 N. W. 504); 29 Cyc. p. 507.

Applying the definitions and principles laid down in the foregoing cases to the facts in the case at bar, we are of opinion that there was no evidence in the case which warranted its submission to the jury upon the question of defendant's gross negligence.

The judgment is reversed, and no new trial is granted.

MOORE, C. J., and STEERE, MCALVAY, STONE, and OSTRANDER, JJ., concurred. BLAIR and BIRD, JJ., did not sit.