CHESAPEAKE & O. RY. CO. v. STEELE (two cases).

(Circuit Court of Appeals, Sixth Circuit. January 4, 1898.)

Nos. 508 and 509.

1. NEGLIGENCE—EVIDENCE.
   Where evidence that a crossing signal was given greatly preponderates, the question of negligence is still for the jury, when there is substantial evidence tending to prove that it was not given in sufficient time to constitute a warning.
2. RAILROAD CROSSINGS—WARNING SIGNALS.
   Crossing signals must be given at such times and places, taking into consideration the speed of the train, obstruction to sound, and all other circumstances, as will enable a careful and prudent man to act upon the warning.
3. CONTRIBUTORY NEGLIGENCE—BURDEN OF PROOF.
   Contributory negligence is a matter of defense to be established by the defendant, and, in the entire absence of proof, it will be presumed that decedents who were killed in a collision at a railroad crossing stopped, looked, and listened before going upon the track.
4. RAILROAD CROSSING—CAUTION—INSTRUCTION.
   It is not error to refuse to instruct that it was the duty of decedents to stop, look, and listen, at a certain point a few feet from the track, before going upon the crossing, when stopping at such point in itself involved a danger to which the attention of the jury was not drawn.
5. SAME—PRESUMPTION.
   An instruction that, if the jury believed decedents could have heard the noise of the approaching train in time to have avoided the collision, they may presume, from the fact that they went upon the track, that they did not listen, is properly refused, as it eliminates the matter of the crossing signal, and does not take into consideration the presumption that decedents knew the danger and exercised reasonable care.

In Error to the Circuit Court of the United States for the District of Kentucky.

Richard and John Steele, brothers, were killed at a place where the public road crosses the Chesapeake & Ohio Railway at grade, by a collision with a fast-moving passenger train, while driving in a buggy across the railroad track. The administratrix of each brought suit against the railroad company for an alleged negligent killing, and these two suits, dependent on the same facts, were tried by the same jury, who found for each plaintiff a separate verdict. Proper judgments were rendered thereon, from which separate writs of error have been sued out by the railroad company.

The issues upon which the case turned were whether the railroad company was guilty of negligence in respect to the precautions it had observed in relation to this crossing, so as to give persons crossing its track, at the time and place of the collision by which the deceased were killed, proper and reasonable warning of the approach of its train, and whether the deceased had been guilty of such contributory negligence as to prevent a recovery.

The facts necessary to be stated are these: The general course of the turnpike road on which the deceased were traveling was north and south, and

that of the railroad east and west, and they crossed at nearly a right angle. The deceased were returning to their homes from the house of one Moore, who lived about one mile north of the railroad. They lived some distance south of the railroad, but were familiar with this crossing. The crossing was a particularly dangerous one, inasmuch as both the railroad and public road approached the crossing through considerable cuts, and a traveler going south on the highway could get no view of the track or of a train on the track, after leaving a point about 200 feet north of this crossing, until he reached a point 19½ feet from the center of the track. Neither cou'd a lookout upon an engine approaching from the east, as was the train with which the deceased collided, see any one approaching this crossing from the north until this point on the right of way and on a level with the railroad cut was reached. If the traveler was driving, as was the case with the deceased, the horse would be about within striking distance of a passing train before persons in a vehicle would be clear of the obstructions to a view of a train approaching from the east. The deceased were young men, warmly wrapped up, the day being cold, snowy, and blustry. When they left Moore's house the sides of their buggy top were strapped down, and their ears were protected, one by the side pieces of a cap drawn down, and the other by ear bobs fastened under the chin. The train with which they collided was a fast passenger train, traveling at a speed of full 50 miles per hour. There was a station whistling post 1,700 feet east of this crossing, where it was customary for crossing whistles to be blown for this crossing. The engineer upon the engine drawing the approaching train was the only eyewitness of the collision, the deceased being instantly killed. This witness in his evidence stated that when from 50 to 60 yards of this crossing he saw the head of the horse driven by deceased as soon as it passed a fence post at the point where the railroad cut intersected the turnpike cut. This was 19½ feet from the center of the track. He next saw the buggy top as it came into view, and then the deceased sitting in the buggy, the sides of the buggy being then up, as he states. He says they seemed to be driving pretty fast, and to increase their speed as they crossed the track. The alarm was sounded and brakes applied, but all efforts to avoid a collision were in vain, the buggy being struck just as the horse passed uninjured across the track.

The negligence of the railroad company, if any, consisted in not giving reasonable notice of the approach of its train to this crossing. Section 773, Ky. St., requires every railroad company to erect a signal board at every grade crossing of a public highway. There was such a crossing post and sign at this crossing. There was also a whistling post 1,700 feet east of this crossing. By section 786 of same Statutes, the whistle is required to be sounded at least 50 rods before crossing a highway at grade, and that the whistle shall be sounded or bell rung continuously until such crossing shall be reached. The signal for a station is one long blast of the whistle, for a crossing two long and two short blasts, and the danger signal is a succession of short blasts.

The following is a summary of the evidence bearing upon the question as to whether a warning was given before reaching this crossing: Owens, the engineer, and Wyant, the fireman, testify that the whistle was sounded at the whistling post and the bell rung from there to the crossing. Stephenson, the conductor, Stratton, the baggage master, and Judd, a brakeman, testify to a distinct recollection of hearing the crossing signal given before the alarm was sounded. H. L. Rowe, a passenger, testifies to a habit of noticing train signals, and to a positive recollection of hearing a crossing signal about one-half minute before an alarm whistle. W. C. Payne, an express company route agent and a passenger on this train, testifies positively to a similar recollection. He says he had a railroad connection to make at Lexington, and was watching the movement of the train with interest, hoping to have time in Lexington to get supper before his train should leave. James Stafford and wife, Sarah Stafford, who lived in the vicinity of the crossing and knew the locality of the whistling post and crossing, both testify to hearing the crossing signal given, and shortly afterwards the alarm signals, and give a circumstance calculated to strengthen their recollection. W. H. Shoemaker, who lived 300 yards from the whistling post, also says he heard the crossing

signal, followed in a short time by alarm signals, but gives no special reason for noticing or remembering. Opposed to this was the evidence of several witnesses, who either say that the signal was not given or that they did not hear it, though they had opportunity to hear it if it had been sounded. They may be summarized thus: L. S. Price, a passenger, heard the danger signal, but did not hear the crossing signal, and thinks he would have heard it if it had been given. A. J. Thomas, a passenger, heard danger signals, but did not notice crossing signal. Cannot say that it did not sound. J. O. Walker, a passenger whose attention was attracted by danger signal, did not hear crossing signal. Thinks it probable he would have heard it. Mrs. Worthington, a passenger, had her attention first attracted by the putting on of the air brakes, and about same time heard alarm whistle. Was noticing the progress of the train, and says she thought they were nearing Lexington, and did not hear any crossing signal. Will Ellis was the witness most relied on to prove the company's negligence. This witness lived near the whistling post, and was standing out in his yard when he heard the train give one long blast for Colby station,—the station about three-quarters of a mile east of this crossing. Knew the crossing signal to be two or three long blasts. The train had not regularly whistled for this crossing, though they frequently did. Heard the train coming something over a quarter of a mile before it reached the whistling post. Saw it as soon at it came out of the cut between Colby's and whistling post. Was attracted by the rapidity with which the train was coming, and watched it until it passed whistling post, and was out of sight in the cut west of the post. He states very positively that the engine did not whistle at the post, nor until out of sight and near the crossing, and that the signal it then gave was three sharp quick blasts, which he says is the danger signal. This witness says that, standing where he stood, he could see the train for about one-third of the way down the cut towards crossing, and that it did not give any signal until clear out of his sight and close to the crossing. On cross-examination he was asked if it whistled any more after he heard the three short, sharp blasts. He answered, "Yes; it blew three short blasts, and then blew again; the second time, two or three times." Being again interrogated as follows, "Then I understand you heard this engine blow three short blasts, and then there was a perceptible pause, and then it blew three short blasts again; that is the fact, is it?" he answered, "Yes, sir." "Q. And after it blew those three short, sharp blasts a second time, it began to slow down? A. Yes, sir. Q. You could tell that it began to slow down? A. I could hear the air of it; the pressure and stop." On re-examination he was asked as follows: "Q. In reference to the question of Judge H., you said you heard quick blasts of the whistle,—some blasts on the track after the train got out of your sight? A. Yes, sir. Q. And then, as the train was about to slow down, you heard three more? A. Yes, sir. Q. What kind of blasts? A. They were not quick together, like those others." Zack Mason, who at the time lived near this crossing, was in a lane near by and in sight of the crossing. Heard the alarm signals. Knew the difference between crossing and alarm signals. Did not hear any signal for the crossing. If it had blown at the whistling post, says he "would have heard it." This was the whole of the evidence upon the matter of signals on approaching this crossing.

John T. Shelby and Humphrey & Davie, for plaintiff in error.

Bronston & Allen and Morton & Darnall, for defendants in error.

Before TAFT and LURTON, Circuit Judges, and CLARK, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of facts, delivered the opinion of the court.

It has been most earnestly argued that the evidence tending to prove negligence in respect to the giving on this occasion of the usual and customary crossing signal was not such as required the submission of that question to the jury. If we confine our attention to the

mere question as to whether any crossing signal was given, it must be admitted that the decided weight of proof was that such a signal was given. If, however, the evidence tending to show a neglect of such precaution amounted to something more than a mere scintilla, it was properly submitted to the jury, and a verdict against the weight of evidence was remediable only upon a motion for a new trial. Railway Co. v. Lowery, 20 C. C. A. 596, 74 Fed. 463; Insurance Co. v. Randolph, 24 C. C. A. 305, 78 Fed. 759; Railway Co. v. Slattery, 3 App. Cas. 1155.

Even upon this aspect of the question of negligence, it cannot be safely said that there was not some substantial evidence tending to show that no warning was given other than the alarm sounded when the deceased were in the act of crossing. The evidence for the defendants in error amounted to something more affirmative in character than a mere statement, by witnesses who might have heard, that they did not hear. One or more of the witnesses for defendants in error were attentive to the movements of the train, and were able to say that no signal other than the alarm signal was given on this occasion. That such evidence was entitled to less weight than that of a witness who testifies to having heard proper crossing signals given is very obvious, and the jury were so advised. Still it is not possible to say that where two witnesses have equal opportunities, and gave equal attention to their surroundings, the denial by one of an occurrence testified to by the other does not make a conflict of evidence. The testimony of the witness Ellis was clearly affirmative in character. He heard the station whistle for Colby about one mile east of this crossing, and saw the train when it first came in sight east of the whistling post, and watched it closely and attentively until it reached and passed the whistling post, and disappeared in the cut between the post and crossing. He says, in a very positive way, that it sounded no whistle until out of sight, and very near the crossing, when he heard an alarm signal of three sharp, quick blasts. It is true that on cross-examination he says that, after a pause, these three blasts were repeated, and were "not so quick together" as the first set, and were followed by the slowing down of the train. It has been argued that the set of longer blasts heard by Ellis was a crossing signal, and that the witness has simply reversed the order in which the two sets of blasts were given, and his evidence, therefore, not in conflict with that of the witnesses who say that a crossing signal was first given, followed shortly by the alarm. This was clearly a question for the jury, for the witness does not say that the second set of blasts were long, but only that they were not so quick as the first. It is altogether probable that the alarm signal was repeated more than once, for Owens, the engineer, says he began whistling as soon as he saw deceased, and continued until he "struck the buggy." Owens describes the alarm signal as "a few short blasts,—four or five." A slight interval and a slight prolongation of some of the second set of blasts would account for the difference noted by Ellis. But the negligence of the railroad company may as well consist in the insufficiency of a signal in respect to timeliness as in a failure to give any Grade crossings are the source of innumerable collisions.

At such a crossing, the rights of the general public traveling the common highway and of the railway company are mutual and reciprocal, and, although common convenience gives to the train of a railway company precedence in the use of such a crossing, it is upon condition that the former will give due warning of its approach, so that a vehicle upon the highway may stop and wait for the other to pass. In the case of Improvement Co. v. Stead, 95 U. S. 161, Mr. Justice Bradley, for the court, thus defined these mutual rights, by saying:

"If a railroad crosses a common road on the same level, those traveling on either have a legal right to pass over the point of crossing, and to require due care on the part of those traveling on the other, to avoid a collision. Of course, these mutual rights have respect to other relative rights subsisting between the parties. From the character and momentum of a railroad train, and the requirements of public travel by means thereof, it cannot be expected that it shall stop and give precedence to an approaching wagon to make the crossing first: it is the duty of the wagon to wait for the train. The train has the preference and right of way, but is bound to give due warning of its approach, so that the wagon may stop and allow it to pass, and to use every exertion to stop if the wagon is inevitably in the way. Such warning must be reasonable and timely. But what is reasonable and timely warning may depend on many circumstances. It cannot be such if the speed of the train be so great as to render it unavailing. The explosion of a cannon may be said to be a warning of the coming shot, but the velocity of the latter generally outstrips the warning. The speed of a train at a crossing should not be so great as to render unavailing the warning of its whistle and bell; and this caution is especially applicable when their sound is obstructed by winds and other noises, and when intervening objects prevent those who are approaching the railroad from seeing a coming train. In such cases, if an unslacked speed is desirable, watchmen should be stationed at the crossing."

Upon this subject the trial judge thus stated the rule in reference to the effect of the speed of a train upon this matter of the timeliness of a crossing signal:

"If it was given, the next inquiry is, was it given in such a manner as to be a warning to those parties? It is of no value unless it prevents those who have a right to go upon the railway track to keep off, while the train is using it or approaching it to use it. Now, in considering the question, you should consider all the evidence fairly and impartially, and say, if there was a warning given for this crossing, was it a proper and reasonable warning; and, in considering that, it is important for you to consider the speed at which the train was coming, because you would readily see that a train coming at twenty or thirty miles an hour might give a warning that would be a real warning, and which would prevent accident, whereas, a train coming forty or fifty or sixty miles would not be in time to prevent others from going upon the crossing. The obligation of the company was to give a warning, and give such a warning, under all the circumstances, as would prevent a careful and prudent, cautious man from using the track, and thus endangering his own safety. The rapidity with which the train was coming as to this crossing is not of itself negligence. If the warning was given, and was given at such a place and at a time as to prevent any damage or injury which might result to those using the public highway, then the fact that the train was coming at forty or fifty miles an hour would not of itself be negligence."

To this we add that where, as in this case, the approaches to a grade crossing are through cuts, so that a traveler on the highway has no view of the track, and where both the noise of an approaching train and the shriek of a whistle must be much obstructed and muffled, it becomes highly important that the warning of an approaching train shall be given by whistle, and at such a point or points as will

most effectually serve to give timely notice to one traveling on the public highway. The customary place for giving such signals by trains approaching this crossing from the east was at the whistling post 1,700 feet east of the crossing, and the effort of the railroad company was to show that the usual signals were on this occasion given at that post. If given there, the train would reach the crossing, at the speed it was traveling, in about 22 seconds. Upon this question the testimony of the witness Ellis was highly pertinent, even if he mistook a crossing signal for an alarm, and mistook the order in which the two distinct signals were given. If no signal was given until the train had passed out of his sight in the cut between the post and crossing, it was a question for the jury to say whether, looking to the speed of this train and the blind character of this ·crossing, it was due diligence to neglect giving a crossing signal at the whistling post, and before entering the cut between the post and crossing, and whether, if given at the crossing, it would more likely have been heard than if given near the crossing and in a cut.

We come now to the question of contributory negligence. The court properly instructed the jury that this was a defense, the burden of supporting same being on the defendant. The exception taken to this part of the charge must be overruled. In courts of the United States this has long been the established doctrine. Railroad Co. v. Gladmon, 15 Wall. 401; Hough v. Railway Co., 100 U. S. 213; Coasting Co. v. Tolson, 139 U. S. 551, 11 Sup. Ct. 653; Railroad Co. v. Volk, 151 U. S. 73, 14 Sup. Ct. 239; Railroad Co. v. Gentry, 163 U. S. 353, 16 Sup. Ct. 1104.

The sixth and ninth requests made by plaintiff in error for special instructions included an instruction that the burden was on the plaintiffs to prove that they were in the exercise of due care and caution in going upon the crossing. These requests involved the converse of the rule on the subject of contributory negligence, inasmuch as, in the absence of all evidence, there is a presumption that decedents were in the exercise of due caution, and the burden of proving that they were not rests upon the defendant throughout the case. Railroad Co. v. Gentry, 163 U. S. 353, 16 Sup. Ct. 1104. These requests, for this reason, were properly denied.

The fifth and seventh requests were intended to raise the question that, under the circumstances of this case, it was the duty of decedents to stop, and look and listen, before going upon this crossing. We think their vice lies in the fact that they included an instruction to stop by turning their buggy across the highway and parallel to the railroad at a point where they could observe the track both ways. The place indicated by both requests was between the track and a fence post on the side of the highway which, by measurement, was precisely 19½ feet from the center of the track. No view of the track for any distance was obtainable by persons driving until after the buggy itself had passed beyond this post. If we allow for the width of the buggy and for the distance a passing train would overlap the center of the track, it will appear that there was barely space for such a position to be taken. A traveler of ordinary prudence, and particularly persons with a nervous or restless horse, might well hesi-

late if required to occupy such a position alongside of a train traveling at nearly a mile a minute. Under such circumstances, it might well be left to a jury to say whether ordinarily prudent persons would not be in the exercise of due and reasonable caution if, when approaching this crossing, they should stop and listen before driving so near the track, even though from the point of stopping no view of the track could be obtained. This instruction, if given, would preclude all inquiry into the question of the dangers incident to assuming a position so near a passing train, where there was so little room for the proper management of a horse, and whether some other precaution had not been observed which, under the circumstances, was equally as prudent as the one indicated. If it be assumed, for illustration, that the decedents did stop and attentively listen just before coming out of the highway cut, and that they heard no crossing signal nor the noise of the train, by reason of the obstructions to sound caused by the cut through which the train was approaching and the adverse direction of the wind, and were thus led to believe that the crossing was safe, the jury would have been obliged, if this instruction had been given, to find for the railroad company, although they might be of opinion that no signals for the crossing were given, and that the conduct of decedents, under the circumstances, was that of reasonably prudent and careful persons. So, if it had appeared that decedents had stopped before driving out on the railway right of way, and that one of them had gotten out of the buggy, and from the side of the track looked both ways, and, seeing no train and hearing no warning, had undertaken to drive across, this, too, would be, under this instruction, no answer to the charge of contributory negligence. The instruction was too narrow, by excluding consideration of all but one mode of approaching this crossing with due care, and in condemning every other suggested precaution. It is true that the place indicated was the only place from which travelers seated in a vehicle could look before crossing. But there may be circumstances when due care would be exercised by reliance on listening alone, and the circumstances of this case were such that it was not error to let the plaintiffs go to the jury upon the question as to whether some other precaution than the one suggested by this instruction would not have been the observance of reasonable care. That there was no evidence tending to show that either of the suggested precautions were taken finds its sufficient answer in the fact that there was no evidence at all as to the conduct of decedents before they were seen in the act of driving upon the crossing. That they were driving and not standing when the engineer first saw them is entirely consistent with the presumption that they had stopped and listened before undertaking to cross. If one of the deceased had theretofore gotten out, and from the side of the track looked east for an approaching train, he would have commanded only some 800 feet of the track. If this train had been beyond the nearest cut, and as far east as Colby, a station east some three-fourths of a mile, he would not have seen this train, and yet before he could have returned to his buggy and crossed the track he would have been run down by this very train, unless warned of its approach by the noise it made in time to wait its

passage. If the burden of proving that decedents were in the exercise .of due care was upon the plaintiffs as something to be proven as a condition of recovery, the absence of any evidence tending to show that they had stopped and looked and listened where the train could be observed, or had stopped and listened before reaching the place where they could see and be seen by an approaching train, would be fatal to this case. But such is not the rule in the courts of the United States. That decedents were in the exercise of due care is a presumption which stands in place of evidence until it is shown that they had been guilty of contributory negligence. In the absence of evidence to the contrary, the presumption is that decedents did stop and listen before they came out where they were seen by the only eyewitness, and that not hearing crossing signals, or the noise of the approaching train, they unconsciously drove into a position of peril.

The eighth request preferred by plaintiff in error was in these words:

"If the jury believe from the evidence that the decedent could have heard the noise of the approaching train in time to have avoided the collision, had he listened for it, it has a right to presume from the fact of his going upon the crossing that he did not listen; and such failure, if there was such, constituted negligence which will prevent a recovery."

This instruction eliminates the matter of a crossing signal altogether, and puts the defense upon the presumption that, because decedents drove upon this crossing in time to collide with an approaching train, the jury might presume that they had done so without listening, if from the evidence they believed that, if they had listened, they would have heard "the noise of the approaching train." The instruction takes no account of the fact that the decedents were acquainted with the dangerous character of this crossing, and had the highest known incentives to the exercise of care and caution before going upon the crossing, where their lives would be in danger in case of a collision. The rule imposing upon the defendant the burden of showing contributory negligence would be easily overcome if this is the law. If to stop and listen before going so near the track as to be able to both look and listen was, under the circumstances of this case, the exercise of due care, which, as we have already decided, was a proper question to go to the jury, then the presumption, in the absence of evidence, is that they did so stop and listen.

That the jury might rightly infer that they had not so stopped and listened, if there was any sufficient evidence tending to rebut the presumption raised only by the absence of evidence, is most obvious; and so evidence that persons driving as these decedents had heard the noise of a train approaching this crossing under like circumstances was, of course, competent upon the issue as to whether they had stopped and listened or been in any way attentive to the danger of this crossing. The rule that contributory negligence is a defense, to be made out by the defendant, rests upon the presumption of the exercise of due care and caution,—a presumption which is removed whenever there is evidence sufficient in law, if credited, to establish contributory negligence. In the case of Railroad Co. v. Gentry, cited above, an instruction almost identical with the one now

under consideration was asked and refused. This refusal was approved by the supreme court which said:

"There was no evidence upon which to rest such an instruction. As already stated, no one personally witnessed the crossing of the track by the deceased, nor the running of the flat car over him. Whether he did or did not stop, and look and listen, for approaching trains, the jury could not tell from the evidence. The presumption is that he did; and, if the court had given the special instruction asked, it would have been necessary to accompany it with the statement that there was no evidence upon the point, and that the law presumed that the deceased did look and listen for coming trains before crossing the track. In Improvement Co. v. Stead, 95 U. S. 161–164, the court, speaking by Mr. Justice Bradley, upon the subject of the relative rights and duties of a railroad company and the owner of a vehicle crossing its track, said: 'Those who are crossing a railroad track are bound to exercise ordinary care and diligence to ascertain whether a train is approaching. They have, indeed, the greatest incentives to caution, for their lives are in imminent danger if collision happen; and hence it will not be presumed, without evidence, that they do not exercise proper care.' This principle was approved in Railroad Co. v. Griffith, 159 U. S. 603–609, 16 Sup. Ct. 105. Manifestly, it is not the duty of the court, when there was no evidence as to the deceased having or not having looked and listened for approaching trains before crossing the railroad track, to do more, touching the question of contributory negligence, than it did, namely, instruct the jury generally that the railroad company was not liable if the deceased, by his own negligent conduct, contributed to his death, and that they could not find for the plaintiffs unless the death of the deceased was directly caused by unsafe switching appliances used by the defendant, and without fault or negligence on his part."

It would have been improper to instruct the jury as requested without also instructing them as to the presumption that they had not only listened, but had stopped and listened. Concerning the conduct of the deceased, after they were seen by the locomotive engineer, the trial court in its charge said:

"Now, in regard to the duty which devolved upon the decedents at the time, I should say that they, in the emergency upon them, were not guilty of negligence, even although they did not adopt the plan and method of getting out of the impending danger which a cool, calm man, sitting calmly by, would have taken, but that you must consider, in considering contributory negligence, what a cautious man would probably have done under the circumstances which surrounded them."

To this no exception was taken, and, indeed, none could be well taken. If deceased were guilty of contributory negligence at all, it was in negligently driving into the position from which escape was most doubtful when warned of danger by seeing or hearing this train. The charge of the court upon the degree of care required from travelers approaching a grade railroad crossing, and upon the effect of contributory negligence, was clear and sound so far as it went, and has not been excepted to, save in the matters already discussed.

Where the undisputed facts of a case are such as that no other reasonable inference can be drawn than that of negligence, it is the plain duty of a trial court to so instruct. Under such a state of facts negligence becomes a question of law. Elliott v. Railway Co., 150 U. S. 245, 14 Sup. Ct. 85; Blount's Adm'x v. Grand Trunk Ry. Co., 22 U. S. App. 129, 9 C. C. A. 526, and 61 Fed. 375; McLeod v. Graven, 19 C. C. A. 616–622, 73 Fed. 627. The obstructions to sight and sound were so serious in approaching this crossing that

it was clearly the duty of decedents to have exercised a degree of care commensurate with its dangerous character. If, with reasonable prudence, the decedents could have stopped where they could both look and listen for an approaching train, they were bound by every consideration of self-preservation to do so. If, however, they could not, with reasonable safety, stop at a place where they could both see and hear, it was all the more imperative that they should stop and listen at the most favorable point near the crossing, and a failure to so stop and listen, under the circumstances of this case, would be inexcusable negligence, and an instruction to this effect might have been properly given. There is nothing in the cases of Railway Co. v. Ives, 144 U. S. 408, 12 Sup. Ct. 679, or Railway Co. v. Farra, 31 U. S. App. 306, 13 C. C. A. 602, and 66 Fed. 496, which, under the remarkable character of this crossing, would have made such an instruction improper. But no request for such an instruction was made. The requests which included the subject of stopping included either a stopping at a particular place, or a proposition as to the burden of proof in conflict with the well-settled doctrine of this court concerning contributory negligence.

The error assigned because of the refusal to instruct the jury to find for the plaintiff in error must be overruled, for the reasons already indicated in this opinion. There is no error, and the judgment must be affirmed.