FOLKMIRE v. MICHIGAN UNITED RAILWAYS CO.

1. TRIAL—DIRECTING VERDICT—NEGLIGENCE.
   On a review of the testimony, it is held that there was no evidence that deceased was killed because of the failure of defendant's motorman to blow the whistle.

2. NEGLIGENCE — STREET AND INTERURBAN RAILWAYS — RATE OF SPEED.
   A rate of 40 or 50 miles an hour in running an interurban car is not, as a matter of law, negligence.

3. SAME—HIGHWAY CROSSINGS—SAFETY DEVICES.
   Failure to maintain safety devices at a dangerous crossing is

actionable negligence only when common prudence requires such precautions.

4. SAME—ORDER OF RAILROAD COMMISSIONER.

That the railroad commissioner has not required a bell or flag-man at a crossing is not conclusive of due care.

5. CONTRIBUTORY NEGLIGENCE—PERSONAL INJURIES.

Where the undisputed evidence shows that the deceased drove upon the track without looking for a car, the presumption that she was exercising due care is rebutted, and a verdict should be directed for the defendant.

Error to Calhoun; North, J. Submitted February 17, 1909. (Docket No. 64.) Decided June 7, 1909.

Case by John F. Folkmire, administrator of the estate of Minnie W. Folkmire, deceased, against the Michigan United Railways Company for the negligent killing of plaintiff's intestate. A judgment for plaintiff is reviewed by defendant on writ of error. Reversed.

*Sanford W. Ladd*, for appellant.

*Jesse M. Hatch* and *Duane C. Salisbury*, for appellee.

HOOKER, J. The plaintiff's wife was instantly killed by a suburban car at a highway crossing. He has sued as administrator, alleging negligence on the part of the defendant. The negligence alleged consisted of—

(1) Failure to give a signal or warning on approaching the highway.

(2) Running the car at a high and dangerous rate of speed.

(3) Maintaining a dangerous crossing at the point where the accident occurred.

(4) Maintaining a crossing without safety devices, such as watchman, gates, and a system of signals other than the whistle on the car.

Plaintiff was given a verdict and judgment for $6,000, and defendant has brought the case to this court by writ of error.

Should the court have directed a verdict for defendant

upon the ground that defendant was not shown to have been negligent ?

1. Failure to give signal. In our opinion there was no evidence that the whistle was not blown for the crossing at the regular whistling post, and there was much testimony that it was blown. *Shufelt* v. *Railroad Co.*, 96 Mich. 334 (55 N. W. 1013).

2. High rate of speed. The evidence is undisputed that the car was running at a speed of 40 or 50 miles an hour. This was not *per se* negligence, but it does not follow that it was not negligent. That must depend on other considerations that will be discussed later.

3. Maintaining a dangerous crossing. 4. Maintaining a dangerous crossing without safety devices. The last two claims of negligence may be considered together. The crossing was made at a long curve of the railroad and in a cut. We judge from the photographs that the excavation was little, if any, wider than was necessary to accommodate the road and its cars. The highway which crossed at grade was not at right angles with the railroad, and the deceased was driving toward the approaching car, but there was no place from which the car could be seen until she reached a point but a few feet from the rail. The distance that it might then be seen, as it came into sight around the curve, was a matter in dispute, but 450 feet is the maximum distance shown. According to plaintiff's theory that the car was 300 or 350 feet from the crossing when it rounded the curve and became visible, running 50 miles an hour, there would be but six seconds before it would reach the crossing if not slowed down; while at 2 miles an hour—the rate that deceased is said to have been driving—it would have taken her more than twice as long to cover the 40 or more feet which the jury might have found it necessary for her to drive to get far enough across to be out of danger.

Counsel say that we have decided that it is not negligence to drive a car at a high rate of speed in the country,

citing the cases of *Robinson* v. *Railroad Co.*, 79 Mich. 328 (44 N. W. 779, 19 Am. St. Rep. 174); *Shufelt* v. *Railroad Co.*, 96 Mich. 329 (55 N. W. 1013); *Tobias* v. *Railroad Co.*, 103 Mich. 339 (61 N. W. 514). These cases do hold that the exigencies of modern travel require rapid transit, and sustain the statement hereinbefore made that a steam car is not necessarily negligently run when a high rate of speed is attained, and that speed alone is not *per se* negligence. It does not follow that a rate of speed making it impossible to get off from a track in safety after it is possible to discover a car is not a negligent rate of speed, nor that it is not negligent to maintain a highway crossing, exceptionally dangerous, without some provision for preventing such accidents. It is true that the whistle and incessant ringing of the bell, together with the noise accompanying a heavy train on a steam road, has generally been deemed sufficient care without placing flagmen or electric bells on the crossings, but there are cases where the contrary has been held. Thus in the case of *Guggenheim* v. *Railway Co.*, 66 Mich. 159 (33 N. W. 166), it was said of an exceptionally dangerous crossing that,

" While there was at the time of the accident no statute limiting the speed of the train over this crossing, yet the speed of such train must nevertheless be consistent with the degree of care and prudence required in good railroad management, and that such crossing must be approached and passed over with the care and prudence commensurate with the rate of speed attained, and the train managed and controlled with that degree of care and prudence required for the safety of the lives and property of the persons rightfully approaching and traveling over such crossing."

In *Freeman* v. *Railway Co.*, 74 Mich. 86 (41 N. W. 873, 3 L. R. A. 594), this claim was made that there could be no negligence in having no flagman where none had been ordered by the railroad commissioner, but we held that this was not conclusive, and sustained a charge that, "when common prudence required a flagman *or*

*his equivalent,"* such provision should be made, if the danger at the crossing was altogether exceptional, because of a situation which rendered ordinary prudence on the part of a driver insufficient protection against injury.   Again in *Willet* v. *Railroad Co.*, 114 Mich. 411 (72 N. W. 260), it was said that the jury should have been allowed to find negligence in not providing some method of giving notice of a train's approach, where view was wholly cut off by a string of freight cars standing upon a city siding.   See, also, *Grand Trunk R. Co.* v. *Ives*, 144 U. S. 408 (12 Sup. Ct. 679).   An elaborate note upon this subject, with a multitude of cases, will be found in the case of *Cowen* v. *Dietrick*, 4 Am. & Eng. Ann. Cas. 294 (101 Md. 46, 60 Atl. 282).

The facts of this case are such as to subject it to the test of this line of cases without invoking any distinctions that might perhaps be based upon the differences between steam and electric roads and the laws pertaining to them.   We think that the refusal of this request was justified by the proof.   In thus holding we do not imply that the jury should have found negligence.   It would depend upon what they found the evidence to be.

2. Contributory negligence.   The undisputed evidence shows that the deceased had a docile horse, that she was familiar with the crossing and the method of running the cars, also that she was driving nearly west, while the cars came from a little north of west, directly toward and in front of her.   She was facing it as it came around the curve.   It is self-evident that the car must have been visible from her wagon as soon as she was visible to the witnesses on the car, whose testimony is the only evidence of what took place.   The plaintiff called two of the six witnesses upon the car.   One was a Mr. Nichols, who sat in the fourth seat from the front end, on the left-hand side of the car.   He saw the buggy before it was struck.   The first that attracted his attention to the woman or buggy was when he saw the horse going onto the track.   He was asked:

"Could you see the woman at that time ?

"*A.* Yes, sir; but I saw the horse first—or right at the same time. * * * The first I saw that called my attention was seeing the horse on the track and as I saw the horse I heard the whistle."

James Elliott, a deputy sheriff, sat in the smoking room at the rear end of the car. His attention was called to the sudden shock of the car, caused by the sudden application of the brakes, and this was followed in four or five seconds by the crash. He did not see the buggy before the accident. The defendant produced four witnesses who were on the car. One Raub, a passenger, sat in the third seat in the observation section on the left or north side of the car, and had a view of the track. The whistle was sounded for the crossing as the car rounded the curve, and he looked out, and saw the rig coming, saw the horse's head in the road coming up on the track. He thought his head was two rods from the north rail at the crossing point, and at the same time he saw the deceased apparently looking down.

"She drove on till she got right on the track. Then she looked up till she seen it. Then she slapped the lines on the horse and tried to get across."

The horse was walking. The whistle was blown again "pretty quick" after he saw the rig, "about the same time" as near as he could remember. This was as they rounded the curve, and he placed the distance at 300 feet. He said that he would not swear positively that she was looking down, and could not tell which way she was looking, but it looked as though she was looking down, and that she first looked in the direction of the car almost at the time the car struck the buggy, when she looked up and slapped the lines on the horse. Fred Barker, the motorman, said he whistled for the crossing at the "board" about 900 feet distant. After this, and about 400 feet from the crossing, he saw the horse walking, and he saw the woman after seeing the horse. He saw her

when she first looked up and saw the car. She was then almost square across the track.

"*Q.* And previous to that, had you seen her looking toward the coming car; and to the west ?

"*A.* Yes, sir.

"*Q.* Then what did she do ?

"*A.* She struck the horse once or twice, then raised up and screamed, raised up as if intending to jump out of the rig.

"*Q.* Previous to that time when she did this, as you say, after she had gotten square onto the track, had she done anything out of the ordinary except to sit in the buggy and drive along in the ordinary way ?

"*A.* No, sir."

On cross-examination he said:

"I was 400 feet away when I saw the horse, according to my best judgment. And the horse was about fifteen feet from where she [the woman] was hit. I could not see her when I first saw the horse."

Floyd Thompson was in the second observation seat. He saw the horse first, just as the car was rounding the bend. He judged him to be 10 or 15 feet from the track, and right afterwards he saw deceased. Signals were previously given. The horse continued to walk until they were on the track. The lady saw the car when she was on the track. She looked up just as she got on the middle of the track, and tried to urge her horse forward. Did not see her look up before that. Frank Thompson was on the car. He saw the whole rig as the car went around the curve. The lady came on not looking to see that the car was coming, as it seemed to him, drove right onto the track, or the horse on the track—he could not say which—before she showed any signs of noticing the car. Then she slapped the horse with the reins, and then the car struck the buggy. This is all of the testimony given by eyewitnesses, and it is all consistent only with the theory that deceased was inattentive, and omitted to look for a car, which was in plain sight before her horse reached a place of danger, and when she could easily have avoided

the accident. The case falls so plainly within the rule laid down in several of our own cases that we are compelled to say that the court erred in not directing a verdict for the defendant upon the ground of contributory negligence. The following cases are in point:

In the early case of *Lake Shore, etc., R. Co.* v. *Miller*, 25 Mich. 290, this question is elaborately discussed, holding that a railroad is a warning of danger, that, if either of the senses of hearing and seeing cannot be rendered available, the obligation to use the other is the stronger, and if one neglects to do this, and ventures blindly upon the track without any effort to ascertain whether a train is approaching, such conduct is of itself negligence, and should be so pronounced by courts, as matter of law. See note to this case in which many other cases are cited. *Haas* v. *Railroad Co.*, 47 Mich. 401 (11 N. W. 216), followed the case last cited; *Mynning* v. *Railroad Co.*, 64 Mich. 93 (31 N. W. 147, 8 Am. St. Rep. 804); *Richfield* v. *Railroad Co.*, 110 Mich. 406 (68 N. W. 218); *Freeman* v. *Railway Co.*, 74 Mich. 86 (41 N. W. 872, 3 L. R. A. 594); *Guta* v. *Railway Co.*, 81 Mich. 291 (45 N. W. 821); *Graf* v. *Railway Co.*, 94 Mich. 579 (54 N. W. 388); *Gardner* v. *Railroad Co.*, 97 Mich. 240 (56 N. W. 603); *Houghton* v. *Railway Co.*, 99 Mich. 308 (58 N. W. 314); *Braudy* v. *Railway Co.*, 107 Mich. 100 (64 N. W. 1056); *Bannister* v. *Railway Co.*, 113 Mich. 530 (71 N. W. 861); *Tucker* v. *Railway Co.*, 122 Mich. 149 (80 N. W. 984); *Proper* v. *Railway Co.*, 136 Mich. 352 (99 N. W. 283), and cases cited; *Kwiotkowski* v. *Railway Co.*, 70 Mich. 551 (38 N. W. 463).

Plaintiff's counsel urge the rule that we must presume that this woman was not negligent under the rule stated in the following cases: *Mynning* v. *Railroad Co., supra; Kwiotkowski* v. *Railwuy Co., supra; Adams* v. *Iron Cliffs Co.*, 78 Mich. 277 (44 N. W. 270, 18 Am. St. Rep. 441); *Grostick* v. *Railroad Co.*, 90 Mich. 608 (51 N. W. 667); *Underhill* v. *Railway Co.*, 81 Mich. 45 (45 N. W. 508). See *Chesapeake, etc., R. Co.* v. *Steele*, 84

Fed. 93, 29 C. C. A. 81, and note. The difficulty is that overwhelming and undisputed evidence shows that she did not stop or even look after reaching a point where either would have done any good, but drove heedlessly upon the track, with the car in plain sight, but a short distance away.

We deem it unnecessary to discuss other questions as they may not arise, should the cause be tried again.

The judgment is reversed, and a new trial ordered.

OSTRANDER, MOORE, MCALVAY, and BROOKE, JJ., concurred.