LITTLEWOOD *v.* DETROIT UNITED RAILWAY.

1. STREET RAILWAYS—NEGLIGENCE—DEATH — AUTOMOBILES — CON-
TRIBUTORY NEGLIGENCE.

In an action for the negligent killing of plaintiff's intestate,
at a crossing, evidence that the deceased stopped his auto-
mobile three or four yards from the interurban track,
that the view was obstructed by a house in the direction
from which the car approached, that when he saw the
car he tried to back up, but his automobile went ahead
then started back, and that the interurban car was op-
erated at a speed of about 50 miles an hour, without sig-
nals of any kind, though one of plaintiff's witnesses tes-
tified that the automobile was only seven or eight inches
from the car track when it stopped, supported a verdict
for plaintiff and raised an issue of fact as to the questions
of negligence and contributory negligence.

2. SAME—EVIDENCE.

That the testimony of the witnesses was negative rather
than affirmative upon the subject of sounding the signals,
did not require the court to direct a verdict, when it was
uncontradicted by any testimony offered by defendant rail-
way company.

Error to Wayne; Van Zile, J. Submitted October 21,
1915. (Docket No. 43.) Decided December 21,. 1915.

Case by Margaret H. Littlewood, as special admin-
istratrix of the estate of Charles F. Littlewood, de-
ceased, against the Detroit United Railway for the un-
lawful killing of the plaintiff's intestate. Judgment for
plaintiff. Defendant brings error. Affirmed.

The following is the blueprint referred to in the
opinion.

*Corliss, Leete & Moody* (*Frederic T. Harward,* of counsel), for appellant.

*Bishop & Kilpatrick,* for appellee.

STONE, J.   This is an action to recover damages for injuries sustained by plaintiff's decedent, resulting in his death two days after the injuries complained of, and in the destruction of his automobile, occasioned by a collision of an interurban car belonging to the defendant with the automobile owned and being driven by plaintiff's decedent on August 31, 1913, on Connors Creek road, at its intersection with Gratiot road, in Wayne county.   Plaintiff's decedent and husband was 50 years of age.   On the day of the accident he had been engaged in carrying passengers, for hire, in his automobile, which had been his business for some time.   He was familiar with the crossing and location. About 4 o'clock in the afternoon of said day plaintiff's decedent was driving alone in his automobile northerly

on Connors Creek road toward its intersection with Gratiot road. The attached blueprint is taken from the record, and will aid in understanding the *locus in quo,* and its surroundings. Connors Creek road runs in a northwesterly direction, although the witnesses speak of it as running north. It is 50 feet wide. Gratiot road runs northeasterly, and is 55 feet wide. The house spoken of as the "Trombley house" is a two-story frame dwelling situated on the northeast corner of these roads. It is 9.7 feet from the front of this house to the easterly lot line of Gratiot road, and 12.9 feet from said lot line to the first rail of the interurban track upon Gratiot road, making 22.6 feet from the front of the house to the easterly rail of the car track. The switch is northerly of the intersection. It is 101.4 feet from the southerly point of the switch—that is, the point nearest to Detroit—to Connors Creek road, and 597.6 feet from the northerly point of the switch, that is, the point nearest Mt. Clemens, to said Connors Creek road. Vanderbeck's saloon was situated on the southwest corner of the roads, with steps fronting on Gratiot road.

The declaration, after stating the duty of the defendant, alleges that its servants, agents, and employees did not exercise reasonable care, caution, and diligence, in that they did not ring a bell or sound a gong, or give any notice or warning of the approach of said car, and did not approach with care and caution, and did not have said car under control, and did not stop said car when plaintiff's intestate with said automobile was being driven, or about to be driven, upon said track; that the crossing was of a dangerous character, and that the defendant did not when approaching said Connors Creek road keep any lookout or keep said car under control so that it could be immediately stopped and controlled; that there were obstructions in the nature of buildings adjacent to said intersection,

and that defendant did not provide any safe, adequate, and effective signal to warn the public and plaintiff's intestate of the approach of said car, failed to employ and station a watchman, or to install gates at said dangerous crossing, or to take any other safe, adequate, and effective means to protect the public and plaintiff's intestate from danger and injury arising from the operating and running of its said cars on Gratiot avenue. The declaration proceeds in the following language; and plaintiff avers that on the day and year aforesaid the defendant, its

"agents, servants, and employees, wholly disregarding their duty in the premises, and while plaintiff's intestate was lawfully operating and driving his automobile as aforesaid, and without any notice or warning, and without ringing a bell or sounding a gong, and in total and utter disregard of the rights of plaintiff's intestate, and without his knowledge, carelessly, negligently, wilfully, and recklessly propelled said car towards plaintiff's said intestate on said Gratiot avenue at a rate of speed, to wit, 50 miles per hour, causing said car to run into and collide with said automobile and plaintiff's said intestate, whereby said intestate was then and there violently hurled and thrown with great force and violence out of said automobile and upon the ground adjacent to said car track,"

alleging that he received injuries from which he died two days thereafter.

The witnesses to the collision who testified were either sitting upon the steps in front of Vanderbeck's saloon or near by.

At the close of plaintiff's case defendant's counsel moved the court for a directed verdict in its favor on the grounds that the plaintiff's decedent was guilty of contributory negligence, and that the defendant had not been shown guilty of any negligence. The court refused to grant this motion, to which ruling defendant duly excepted, and the case was thereupon, without any evidence upon the part of the defendant, sub-

mitted to the jury upon the questions whether plaintiff's decedent approached the crossing with the care which a reasonably prudent man would have used under the circumstances, and whether defendant was guilty of negligence.

It was the contention of the defendant, in the court below and in this court, that the record shows, as matter of law, that plaintiff's decedent did not use that care in approaching this crossing in his automobile which the law requires; and it is upon the alleged error of the court in refusing to direct a verdict upon the grounds aforesaid, as requested by defendant's counsel, that the case is before this court. The trial resulted in a verdict for the plaintiff for $3,635 damages.

The eyewitnesses who testified were foreigners— Belgians—and it is evident, from a perusal of the record, that they did not readily understand the English language, and there is considerable confusion in their testimony.

Upon the question of contributory negligence, it is the claim of defendant, gathered from the testimony of plaintiff's witnesses, from the blueprint, and certain photographs that were offered in evidence, that it is undisputed that, when the plaintiff's decedent made his first stop, he was not out from behind the Trombley house; that he drove up toward the track without stopping after he got out from behind the Trombley house until he was within 7 or 8 inches of the track, and within the danger zone; also, it is urged that it appears from the record that decedent not only failed to look for a car after getting out from behind Trombley's house, where he could have seen one, but proceeded either upon or so close to the track that he was hit by the car, which was within 100 feet or less of him when he neared the track, and whose approach then, by a mere glance to the right, he would have detected had he been in the exercise of ordinary care.

The question of the contributory negligence of plaintiff's decedent was first discussed by counsel. In order for the defendant to prevail upon this point, it must appear, taking the most favorable view of the testimony of plaintiff's witnesses, that there was no evidence of the exercise on the part of plaintiff's decedent of the care which a reasonably prudent person would be expected to use under the circumstances.

Ella Blumdele, one of the principal witnesses for the plaintiff, testified that at the time of the collision she was sitting on the front steps of Vanderbeck's saloon with Mrs. Vanderbeck and another witness, who had died before the trial. She testified that she saw the plaintiff's decedent approaching the intersection of the roads, riding in his automobile, coming in a northwesterly direction; that he was running pretty slow. In her direct examination the following occurs:

"*Q.* How was it running when you saw it, Mrs. Blumdele?

"*A.* Pretty slow.

"*Q.* What did it do when it came up towards the car track?

"*A.* Well, at the corner of the house he stopped and he looked. He seen nothing, and he ran a little further. Then he stopped again. Then he started ahead a little further, and the car catch him. He stop the machine.

"*Defendant's Counsel:* What is that; I didn't understand that?

(The answer was repeated by the stenographer.)

"*A.* (Continuing.) When he was there a few yards away from the car track he stopped his machine. He did not see anything, and he started again. When he came near to the car track, he stopped again, and he tried to brake this machine, to back up, but the car hit him.

"*Q.* Where was the street car when you first saw it?

"*A.* On the switch.

"*Plaintiff's Counsel:* Ask her that again.

(The question was here repeated by the stenographer.)

"*A.* I couldn't exactly tell you how far it was.

"*Q.* Was it near the switch?

"*A.* Yes.

"*Q.* Did you know there was a switch up above there, did you?

"*A.* Yes; it comes near to Trombley's house there.

"*Q.* How fast was the street car going when you saw it first?

"*A.* It was pretty fast. * * *

"*Q.* This automobile when it was coming on Connors Creek road towards you, can you tell how fast it was going before it stopped?

"*A.* Just like a horse would run, easily.

"*Q.* Where did it stop first?

"*A.* Three or four yards away from the road.

"*Q.* Well, do you mean the street car track?

"*A.* Yes.

"*Q.* When the automobile stopped, what did the man do at the time?

"*A.* He looked up the way to Mt. Clemens, and he looks that way.

"*Q.* Then what did he do?

"*A.* Well, he started again.

"*Q.* He started his machine up?

"*A.* Yes.

"*Q.* How far did he go then?

"*A.* Well, not far from the track; close to the track.

"*Q.* Did he get his machine up close to the track?

"*A.* Yes.

"*The Court:* No; ask her if he got his machine up on the track.

"*A.* No; he was not on the rails yet.

"*Q.* When the street car hit him, where was the automobile?

"*A.* Just struck the track then.

"*Q.* Was his automobile moving or was it standing still when the street car hit it?

"*A.* He was standing still.

"*Q.* What was the man in the automobile doing when his car was on the street car track?

"*A.* He did something with his feet.

"*Q.* How much of the automobile was over on the street car track; could you tell?

"*A.* About four or five fingers.

"*Q.* What part of the automobile was on the street car track?

"*A.* The front."

This witness afterwards testified that the car, as it approached, was running at least 50 miles an hour and hit the automobile; and she described how the automobile was struck and demolished and the car thrown from the track.

"*Q.* Did this street car that came down here and hit the automobile give any alarm or blow any whistle?

"*A.* I didn't hear nothing. I was looking at the street car when the automobile was there. I was near enough to the street car to hear it if it blew a whistle. There was nothing between me and the street car that was coming. It was a nice day. The sun was shining."

Upon cross-examination this witness testified, among other things, as follows:

"* * * The track is perfectly straight along there towards Mt. Clemens.

"*Q.* Well, now, when you saw the automobile first, how far from the track was it?

"*A.* There was a big tree there.

"*Q.* How far would that be; how many yards?

"*A.* I don't know; I didn't measure it.

"*Q.* Well, you seem quite expert. How far would you say; how many yards?

"*A.* I don't know; I couldn't tell you that.

"*Q.* How far in this room; as far from you over to the end of the room?

"*A.* I couldn't tell you; I don't know.

"*Q.* Do you know how far the tree is? Would it be as far from you as to the clock there on the wall?

"*A.* Yes; I guess so; so far as from here to the wall. (The record shows that the deputy sheriff measured the distance and found it to be 52 feet.)

"*Q.* You saw that automobile that distance away from the track? Where was the street car then?

"*A.* I didn't see the street car at that time. I could not exactly tell you where the street car was then.

"*Q.* Was it in sight?

"*A.* I couldn't tell you that; I didn't see it.

"*Q.* Well, did the automobile come right on?

"*A.* No; he stopped first.

"*Q.* Well, how far from the track did he stop?

"*A.* Three or four yards.

"*Q.* Twelve or fifteen feet?

"*A.* Yes.

"*Q.* Well, was he out from behind Trombley's house when he stopped?

"*A.* No; no; he was not behind Trombley's house when he first stopped. He could see the car.

"*Q.* Did you see the car then?

"*A.* I didn't look at the street car at that time.

"*Q.* Had you seen the street car then?

"*A.* No; I didn't see her yet.

"*Q.* Well, after that time did he go right over to the track, or did he stop again?

"*A.* He stopped again.

"*Q.* Where was that when he stopped again?

"*A.* Close by the track.

"*Q.* Was he on the track the last time that he stopped there; the second or the next time after he stopped, was he then on the track?

"*A.* Four or five fingers from the track.

"*Q.* What does she mean by four or five fingers?

"*A.* Why, put your hand like this (indicating) ; four or five fingers like that.

"*Q.* Was the front of the automobile on the track?

"*A.* No; he was not on it yet.  *  *  *

"*Q.* Was there any part of his machine on the track?

"*A.* No.

"*Q.* But you put your hands up how far the front of the automobile was from the rail?

"*A.* (Witness indicates.)

"*Q.* The very front?

"*A.* Like that (indicating).

"*The Court:* About six or eight inches.

"*Q.* About six or eight inches? Well, now, where was the car then?

"*A.* She was then on the switch. I have seen her then.

"*Q.* What did she say then? When this man came up in the automobile and stopped there, you say four or five fingers from the track, the street car, you say,

was then at the switch; that is the end of the switch nearest you; is that right?

"*A.* Yes.

"*Q.* Was that the first time that you had seen the street car?

"*A.* Yes.

"*Q.* And it was one hundred feet? By this map it was one hundred and one feet away. Now, you say it was coming fifty miles an hour, do you?

"*A.* Yes. * * *

"*Q.* Now, let's see if we understand each other. This man came up, and he stopped about three or four yards from the track.

"*The Court:* No; five yards the first time.

"*Plaintiff's Counsel:* No; three or four, your honor.

"*Defendant's Counsel:* Three or four.

"*Q.* Now, this man is coming north on Connors Creek road—the man in the automobile?

"*A.* Yes; towards the track.

"*Q.* You saw him when he was fifty-four feet away, as far as from you to that wall?

"*A.* Yes.

"*Q.* He was coming slowly, you say, very slowly?

"*A.* Very slow.

"*Q.* What kind of an automobile did he have, an open car or a closed car, or what?

"*A.* It was an open car.

"*Q.* And he came up towards the track? When he was three or four yards from the track you say he stopped?

"*A.* The first time; yes.

"*Q.* You did not know where the car was then?

"*A.* No.

"*Q.* You did not see the car; you did not look at the car?

"*A.* No, sir.

"*Q.* Meaning the street car, did you?

"*A.* No, sir.

"*Q.* Then the man came right on, and he stopped when the front of his car was, say a foot, from the track?

"*A.* Yes. * * *

"*Q.* When he came to a stop the second time the street car was on the switch?

"*A.* Yes, sir.

"*Q.* Coming down at 50 miles an hour; is that right?

"*A.* Yes, sir.

"*Q.* It struck the automobile while it was in that position; is that right? The street car hit the automobile while the automobile was, as you say, that far from the track, about eight inches?

"*A.* No; this man saw the street car coming, and he tried to back up. I think it was, something what he tried to do with his feet. But, in place of when the machine was there going backwards, she went a little frontwards, then started back. Then he was hit.

"*Q.* Well, then, the way it looked to you that the man in the automobile did not see the street car until he was up there about six or seven inches from the track; is that right? (Strike that out.) When he saw the street car, what did the automobile man do?

"*A.* That is it; he tried to press something down with his foot.  *  *  *

"*Q.* So that, when this man in the automobile, Mrs. Blumdele, stopped the first time, he could not see up the track, could he?

"*A.* Well, he could see the switch, though, but not very far.

"*Q.* You could not see very far up the track until you got beyond the porch?

"*A.* No.

"*Q.* This man didn't stop again with his automobile until he got up within eight inches of the track, did he?

"*A.* When he came eight inches from the track.

"*Q.* When this man stopped his automobile the first time, what did he do?

"*A.* He looked.

"*Q.* Which way did he look?

"*A.* On the side of Trombley's house.

"*Q.* Then at the time did you see the street car?

"*A.* No."

This testimony is followed by that of the witness Mary Vanderbeck. From the testimony of this witness counsel for defendant contends that it appears that plaintiff's decedent made no stop until he was about seven inches from the track. It appears, however, that this witness testified that the driver stopped

his automobile near the fence, and, although it is true she used the expression "six or seven inches" in estimating the distance from the track, she later testified that she did not know how long a foot was. In her cross-examination the following appears:

"Q. And then he gets within six or seven inches of the track—

"A. Until he gets up to the fence.

"Q. Well, is it the fence now?

"A. That is, the front part; it is the front part. The fence is the front part of Trombley's house.

"Q. What does he do when he gets to the fence?

"A. He stopped and looked.

"Q. How far was he from the track?

"A. It is almost up to the track; the fence and the car track is almost together.

"Q. The fence is not on the track?

"A. No; it is a very little between, when he started up again.   *   *   *

"Q. Did he stop twice before he got to the railroad track?

"A. No; he came along slowly.

"Q. You say he stopped by the fence down there?

"A. That is the fence, is near to the track.

"Q. Is near to the car track?

"A. Yes, sir.

"Q. But it is not six or seven inches.

"A. It looks to me it is that much.

"Q. There would not be any fence there along if it was six or seven inches from the track?

"A. I couldn't tell you exactly.

"Q. That is the only time he stopped, was it?

"A. He stopped right close on the corner, right on the corner.

"Q. Close to the car track?

"A. Close to the car track."

The plaintiff claims that there was evidence showing that the plaintiff's decedent stopped and made his first observation after he had passed from behind the Trombley house, being at a point less than 22.6 feet from the nearest rail, and variously described by the witnesses as being 3 or 4 yards from the rail, or be-

yond the corner of the house, or near the fence; that he made the first stop at a proper point of observation, and, although he looked, he did not see the car, the inference being that the car was not then in sight. There was evidence that there was a northbound car on the side track at the time, although the photographs, taken 20 days later, do not show this car. The court, counsel,. and jury visited the place of the accident and viewed the premises. The solution of the question of contributory negligence is found in the answer to the question: Did plaintiff's decedent do what a reasonably prudent man would have done under the circumstances?

1. Confusing as some of the testimony is, we are unable to say that there was no evidence tending to show that plaintiff's decedent stopped his car and looked in the direction of Mt. Clemens when within 3 or 4 yards of the first rail of the track; in fact, there is positive testimony that he did so stop and look. If he stopped and looked at that place, and saw no car approaching, we cannot say, as matter of law, that he did not act as an ordinarily prudent person should in then proceeding toward the track. *Palmer* v. *Railroad Co.*, 56 Mich. 1 (22 N. W. 88) ; *Coffee* v. *Railroad Co.*, 139 Mich. 378-381 (102 N. W. 953). The evidence is undisputed that, when he made his final stop, he endeavored to move his car backward, but that, in the confusion, it went forward and then back. He doubtless saw his perilous condition at that time, and was unable to extricate himself. In our opinion, the question of contributory negligence was one for the jury, and the trial court did not err in submitting it as a question of fact.

2. Upon the subject of signals two other witnesses besides Mrs. Blumdele testified that they heard no signal. One of such witnesses testified.

"He didn't blow; me think the car did not blow, or

I hear it that way. If a car blow, me think I can hear it right away. It was nice weather; there was no wind. I didn't hear any blow."

There seems to be no question upon this record that the speed of this car as it approached the automobile was from 50 to 60 miles an hour. Counsel for defendant urged that this court had held that it was not *per se* negligence for cars to run at the rate this car was shown to have been running, and cites cases, including that of *Folkmire* v. *Railways Co.*, 157 Mich. 159 (121 N. W. 811, 17 Am. & Eng. Ann. Cas. 979). It is true that in that case this court held that the rate of speed of 40 or 50 miles an hour was not *per se* negligence, but the court further said it did not follow that it was not negligence; that that must depend upon other considerations. In that case Justice HOOKER, speaking for the court, said:

"Counsel say that we have decided that it is not negligence to drive a car at a high rate of speed in the country, citing the cases of *Robinson* v. *Railroad Co.*, 79 Mich. 328 [44 N. W. 779, 19 Am. St. Rep. 174]; *Shufelt* v. *Railroad Co.*, 96 Mich. 329 [55 N. W. 1013]; *Tobias* v. *Railroad Co.*, 103 Mich. 339 [61 N. W. 514]. These cases do not hold that the exigencies of modern travel require rapid transit, and sustain the statement hereinbefore made that a steam car is not necessarily negligently run when a high rate of speed is attained, and that speed alone is not *per se* negligence. It does not follow that a rate of speed making it impossible to get off from a track in safety after it is possible to discover a car is not a negligent rate of speed, nor that it is not negligent to maintain a highway crossing exceptionally dangerous without some provision for preventing such accidents. It is true that the whistle and incessant ringing of the bell, together with the noise accompanying a heavy train on a steam road, has generally been deemed sufficient care without placing flagmen or electric bells on the crossings, but there are cases where the contrary has been held."

189 Mich.—26.

We are not aware that this court has ever held that it might not be negligence to run a car in a public highway, over a frequented crossing, even in the country, at a rate of speed of 50 miles an hour, without signals of any kind. But it is urged by counsel for defendant that there was no evidence here that the whistle was not sounded or signal given; the only evidence being negative evidence. We are not prepared to say that this evidence, standing uncontradicted, is no evidence to be submitted to the jury, in the absence of affirmative evidence opposed to it. In our opinion, the question of negligence was properly submitted to the jury.

We find no reversible error in the record, and the judgment below is affirmed.

BROOKE, C. J., and PERSON, KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.